**UNITED STATES DISTRICT COURT**
DISTRICT OF NEW JERSEY



MARTIN LUTHER KING JR. FEDERAL BLDG. & U.S. COURTHOUSE
50 WALNUT STREET, P.O. BOX 419
NEWARK, NJ 07101-0419
(973) 645-6340

WILLIAM J. MARTINI
    JUDGE

## LETTER OPINION

August 14, 2008

John T. Ambrosio
Ambrosio & Associates, LLC
317 Belleville Avenue
Bloomfield, NJ 07003
    (*Attorney for Plaintiff*)

Allan B.K. Urgent
Office of the United States Attorney
970 Broad Street, Suite 700
Newark, NJ 07102
    (*Attorney for Defendant*)

**RE:**     **Della Ferra v. Potter**
          **Civ. No. 05-5734 (WJM)**

Dear Counsel:

    This matter comes before the Court on Defendant's Motion for Summary Judgment. Plaintiff opposes the motion. Pursuant to Fed. R. Civ. P. 78, no oral argument was held. For the reasons discussed herein, Defendant's motion is **GRANTED**.

### FACTUAL AND PROCEDURAL HISTORY

    Plaintiff Joseph Della Ferra is a white male, born in 1957, who began working for the United States Postal Service as a full-time letter carrier in 1981. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶¶ 1–2.) From 1985 until his termination in 2004, he delivered mail on the same route — Route 955 — in Belleville, NJ. (*Id*. ¶¶ 3–5, 35; Pl.'s Cert. ¶ 2.) The Postal Service's primary justification for Plaintiff's termination was his perpetual failure to complete his route within the appropriate amount of time. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶¶ 30, 35; Pl.'s Cert. Ex. P.)

As part of their jobs, letter carriers are required to "case" mail in the office, which means to put the mail in order prior to going out for delivery. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶ 7.) The time required to deliver mail is referred to as a carrier's "street delivery time" or "street time." (*Id.*) In general, the Postal Service aims to structure its delivery routes such that the total amount of time required for a letter carrier to complete both the office and street responsibilities is eight hours. (*Id.* ¶ 8.)

Plaintiff admits that ninety percent of the time he was assigned as the full-time carrier for Route 955, he did not complete his office and street responsibilities within an eight-hour day. (*Id.* ¶ 9; Pl.'s Dep. I 84:17–22.) It is also undisputed that others who substituted for Plaintiff were able to complete Route 955 in the appropriate amount of time, as was Plaintiff when he was under direct supervision. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶ 37; Admin. Hr'g Tr. 131:14–134:17, June 21, 2005 (Carmen Fede Test.).) On the days when Plaintiff did not complete all of his deliveries on time, the Postal Service spent additional money either paying Plaintiff overtime, or paying other carriers to complete the deliveries. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶ 10.) Between 1987 and 1999, Plaintiff received five warning letters and one suspension for failing to complete his route within the allotted time, which the Postal Service refers to as "expansion of street time." (*Id.* ¶¶ 12–17; Pl.'s Cert. ¶ 5.) Thereafter, Plaintiff continued to receive discipline for expansion of street time, including a 10-day suspension in mid-2001. (Pl.'s Cert. Exs. J, K.)

Plaintiff alleges that in his last three years on the job, he became a target of harassment by management that resulted in unfair scrutiny and disciplinary charges for minor, technical violations for which no other letter carriers were held accountable.[1] (Pl.'s Cert. ¶ 2.) Plaintiff consistently objected to what he perceived as unfair charges by filing grievances through his union, some of which were successful. (*See generally* Compl.; Pl.'s R. 56.1 Stmt.; Pl.'s Cert.) Plaintiff also filed informal complaints with the Equal Employment Opportunity Commission ("EEOC") in 2000 and 2001, as well as a formal complaint in 2002, all of which were resolved by agreements between the parties, and none of which resulted in any admission of discrimination by the Postal Service. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶¶ 38–39; Pl.'s Cert. Exs. Q, R, T, U.)

---

[1] Among the rules Plaintiff was charged with violating, which he brushes aside as "an absurd Post Office-ism," is the requirement that carriers "finger the mail" between deliveries. (Pl.'s Br. Opp. Summ. J. 2.) "Fingering the mail" is a practice in which a carrier sorts through the letters in his hand between houses and gets them ready ahead of time, rather than stopping and standing to sort in front of each mailbox. Supervisor Carmen Fede testified that letter carriers are instructed to follow this practice because it is the most efficient, explaining that "[w]hile it may be a few seconds, when you multiply that by 501 deliveries, by the entire city of Belleville that has over 10,000 deliveries and the entire country, that little act of fingering the mail saves the US Postal Service enormous amounts of money." (Fede Dep. 48:10–49:4.)

2

Pursuant to the settlement of Plaintiff's first EEO complaint, the Postal Service agreed to re-evaluate Plaintiff's route by conducting a special route inspection — basically, an accounting of the time reasonably required to complete the route, arrived at by having different individuals accompany Plaintiff as he delivered the mail. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶¶ 18–19, 39; Pl.'s Cert. Ex. Q.) As part of the settlement, Plaintiff stipulated that he would perform his duties in accordance with the M41 (the handbook describing carriers' duties and responsibilities), and all parties agreed to abide by the results of this inspection. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶ 39; Pl.'s Cert. Ex. Q.) The inspection was conducted in May 2001. Based on the average street time and the average volume of mail delivered over a period of five days, the appropriate "street time" for Route 955 was found to be 5 hours and 20 minutes. (Pl.'s Cert. Ex. H.) Although Plaintiff disputes that the inspection was accurate or conducted according to Postal Service regulations, he fails to support his argument that the inspection was materially deficient. (*See* Pl.'s Cert. ¶¶ 14–15.) Plaintiff's union did not contest the findings of the inspection. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶ 20.) After the inspection, on at least two or three occasions, Plaintiff's supervisors accompanied Plaintiff on his route in an attempt to coach Plaintiff in proper work methods. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶ 22.)

On November 14, 2001, Plaintiff was issued a Notice of Removal (essentially, a termination notice) containing six charges, including expansion of street time and failure to follow instructions. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶ 23.) Plaintiff filed a grievance, which was resolved in a Step B decision issued by a dispute resolution team on December 26, 2001. (*Id*. ¶ 24; Pl.'s Cert. Ex. M.) That decision, to which the parties refer as the "Last Chance Agreement" or "Last Opportunity Decision," was signed by representatives of management and the union. The agreement explicitly stated that due only to Plaintiff's twenty years of service with the Postal Service, his removal would be held in abeyance for two years to give him "a **last** opportunity to correct his conduct and behavior." (Pl.'s Cert. Ex. M.) (Emphasis in original.) It further cautioned that "**[a]ny** further failure to follow instructions and postal regulations/rules will give cause to activate a removal action." (*Id*.) (Emphasis in original.)

In January 2002, Plaintiff was placed on off-duty status following an accident in his postal vehicle. (Pl.'s R. 56.1 Stmt. ¶¶ 35–36.) After a grievance was adjudicated in his favor, he returned to full-time duty in January 2003. (*Id*. ¶ 37.) Upon his return, Plaintiff was provided with a week of "retraining," which consisted of several different employees accompanying Plaintiff for parts of his route to tutor him in sorting and delivering the mail efficiently. (*Id*. ¶ 38; Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶ 27.)

Plaintiff was subsequently issued Notices of Removal on February 20, 2003 and June 20, 2003, both of which alleged that Plaintiff had violated the Last Chance Agreement, among other charges. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶¶ 29–31.) Plaintiff filed a grievance with respect to the February 2003 removal notice. An

independent arbitrator resolved the grievance in favor of the Postal Service on January 21, 2004, and Plaintiff's termination became effective that day. (Pl.'s Cert. Ex. P; Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶ 35.)  While finding that two of the four charges against Plaintiff lacked merit, the arbitrator concluded that Plaintiff had violated the Last Chance Agreement by his chronic failure to perform his duties, despite multiple opportunities, retraining and progressive discipline.  (Pl.'s Cert. Ex. P.)  The letter carrier who replaced Plaintiff on Route 955 was a 48-year-old African-American female.  (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶ 36.)  A one-day route inspection conducted on April 27, 2005 determined the replacement carrier's street time to be 5 hours and 14 minutes.  (Padilla Decl. Ex. A.)

This case arises from a complaint to the EEOC, filed on August 2, 2003, in which Plaintiff challenged (1) management's failure to afford him certain overtime opportunities in February 2003; (2) the February 2003 removal notice; and (3) the June 2003 removal notice.  Following a hearing, an administrative law judge concluded on June 21, 2005 that the Postal Service did not discriminate or retaliate against Plaintiff, and entered judgment in favor of the Postal Service.  (Hrinuk Decl. Ex. B.)  Plaintiff timely brought this suit contending that in failing to afford him certain overtime opportunities and in wrongfully terminating his employment, the Postal Service discriminated against him on the basis of his color (white), sex (male), age (46 years old at the relevant time), and in retaliation for having engaged in prior EEO activity.  Defendant has now moved for summary judgment.

## DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; rather, only disputes over facts that might affect the outcome of the lawsuit, under the governing substantive law, will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  At the summary judgment stage, this Court must view all evidence and consider all reasonable inferences in a light most favorable to the non-moving party. *Marzano v. Computer Science Corp.*, 91 F.3d 497, 501 (3d Cir. 1996).

**I.    DISPARATE TREATMENT CLAIMS**

In the absence of direct evidence of intentional discrimination, a Plaintiff alleging disparate treatment under Title VII or the ADEA must proceed under the familiar burden-shifting framework announced in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  Under Title VII, Plaintiff must establish a *prima facie* case by showing that (1) he is a member of a protected class, (2) he was qualified for the position he held,

4

(3) he suffered an adverse employment action, and (4) similarly situated persons who are not members of the protected class were treated more favorably, or the circumstances of his termination give rise to an inference of discrimination. *See id.* at 802; *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999). For his ADEA claims, Plaintiff must show that (1) he was over 40 at the time of the adverse employment decision, (2) he is qualified for the position he held, (3) he suffered from an adverse employment decision, and (4) he was replaced by a sufficiently younger person to permit a reasonable inference of age discrimination. *See Fasold v. Justice*, 409 F.3d 178, 184 (3d Cir. 2005).

Here, Plaintiff appears to have abandoned his disparate treatment claims. Plaintiff's brief in opposition to summary judgment focuses almost exclusively on his retaliation claims. As to disparate treatment, Plaintiff offers only one conclusory sentence at the end of his brief — unsupported by facts, analysis or argument — that the denial of overtime opportunities and the two removal notices constituted disparate treatment based on Plaintiff's color, age, or gender. Moreover, Plaintiff's Statement of Material Facts fails to include any facts in support of these claims. Because the Court's review of the record also fails to locate support for a *prima facie* showing of disparate treatment under Title VII or the ADEA, Defendant is entitled to summary judgment on these claims.

## II.    RETALIATION CLAIMS

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must tender evidence that (1) he engaged in activity protected by Title VII, (2) his employer took an adverse employment action against him, and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006). If the employee establishes a *prima facie* case, the burden shifts to the employer to advance some legitimate, non-retaliatory reason for its conduct. *Id.* at 342. If the employer meets its burden, the employee must be able to show "that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (quoting *Krouse v. American Sterilizer Company*, 126 F.3d 494, 500–01 (3d Cir. 1997)).

### A.    Denial of Overtime Opportunities

With respect to Plaintiff's claim regarding the denial of overtime opportunities on February 25 and 26, 2003,[2] it is undisputed that Plaintiff engaged in statutorily protected

---

[2] The Complaint cites three additional dates which Plaintiff now concedes were included by mistake. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶¶ 52–54.)

5

activity by filing complaints with the EEOC.[3]  However, Plaintiff fails to establish a *prima facie* case of retaliation because there is no evidence that Plaintiff was subjected to an adverse employment action with respect to overtime assignment on either date.

On February 25, 2003, Carol Severino — a letter carrier who was not on the Overtime Desired List ("ODL") — was given 5 hours of overtime. (Def.'s R. 56.1 Stmt. & Pl.'s Resp. ¶¶ 48, 55.)  Plaintiff alleges that because he was on the ODL, he should have been given this overtime instead of Severino.  However, undisputed evidence shows that Plaintiff worked 9.61 hours on his own route that day, and would not have been available for 5 additional hours of overtime.  (*Id*. ¶ 55.)

On February 26, 2003, Plaintiff's day off, Plaintiff was offered the chance to work 8 hours of overtime, but refused the opportunity by informing the supervisor that he could only work 7.5 hours.  (*Id*. ¶ 56.)  Plaintiff contends that because Severino had been permitted to work less than 8 hours of overtime the day before, Plaintiff should have been allowed to work less than 8 hours of overtime on February 26.  The comparison is inept.  There is no evidence to demonstrate that the type of overtime work offered on both days was comparable, or that the Postal Service could have or should have settled for 7.5 hours of overtime instead of 8 on February 26.  Moreover, in this case it was Plaintiff's decision to refuse the 8 hours of overtime because of his own preexisting personal commitment.

For these reasons, Defendant is entitled to summary judgment on Plaintiff's claims of retaliation with respect to overtime opportunities.

### B.  February 2003 Removal Notice

With respect to Plaintiff's claim that the February 2003 removal notice was issued in retaliation for Plaintiff's EEO activity, the first two elements of Plaintiff's *prima facie*

---

[3]  Plaintiff contends that his history of filing grievances and speaking out against his superiors also constitutes "protected activity" under Title VII.  However, although Plaintiff's grievances and speech opposed what he perceived to be unfair practices and violations of a labor agreement, they were not aimed at opposing practices made unlawful by Title VII — i.e., discrimination on the basis of color, religion, etc.  Therefore, they are not protected activity for the purpose of establishing a *prima facie* case of retaliation.  *See Moore*, 461 F.3d at 341.  Nonetheless, this history is still potentially relevant.  As discussed below, events occurring in the time between Plaintiff's EEO activity and his termination can be relevant to establishing the requisite "causal connection" between the two.  *See Krouse*, 126 F.3d at 503–04.  The history could also be relevant to pretext, if it could undermine the employer's proffered legitimate explanation for Plaintiff's termination.  *See Fuentes v. Perskie*, 32 F.2d 759, 765 (3d Cir. 1994).  In analyzing Plaintiff's claim of retaliation based on EEO activity, therefore, the Court will consider Plaintiff's grievances and related activity insofar as it has relevance for these purposes.

case are undisputed.  However, Defendant argues that Plaintiff cannot establish the third element — that there was a causal connection between the protected activity and the adverse employment action.  *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).  The Court agrees.

A causal connection can be established by circumstantial evidence sufficient to raise the inference that the protected activity was the likely reason for the adverse action.  *See id.* at 177.  Here, as to Plaintiff's 2001 and 2002 EEO complaints, timing provides some evidence to support such an inference; only three months separated the November 21, 2002 settlement of those claims and the February 20, 2003 removal notice.[4]  This timing alone, however, is not so "unusually suggestive" of retaliatory motive that it could, standing alone, support a finding of causation.  *See Krouse*, 126 F.3d at 503.  Ultimately, the Court must consider whether the proffered evidence, viewed as a whole, could suffice to raise an inference of causation.  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3d Cir. 2000).  Such evidence could include, but is not limited to, evidence of antagonism or retaliatory animus during the intervening period between Plaintiff's protected activity and his termination.  *Id.* at 280–81.

Indeed, Plaintiff urges the Court to find a pattern of antagonism that could support an inference of retaliation.  In the time period between October 3, 2000 — the date of his first informal complaint — and the February 2003 notice, Plaintiff was subjected to discipline on several occasions, which invariably led to his filing of grievances, some of which were sustained.  Certainly, there is evidence of friction between Plaintiff and his supervisors over that time period.  There is also evidence that Plaintiff's performance was closely monitored, and that Plaintiff was frequently called to answer to Postal Service rules and regulations.  Nonetheless, there is no direct or inferential link between these facts and Plaintiff's EEO filings, and the critical question is whether the evidence could demonstrate an intent to retaliate.  *See Jensen v. Potter*, 435 F.3d 444, 449 n.2 (3d Cir. 2006).  A pattern of *discipline* — for violations to which Plaintiff offers no reasonable defense — does not equal a "pattern of antagonism" that could demonstrate retaliatory motive on the part of the employer.  *See id.* at 449 ("Many may suffer . . . harassment at work, but if the reason for that harassment is one that is not proscribed by Title VII, it follows that Title VII provides no relief.").  The evidence here simply does not suggest a link between Plaintiff's EEO filings and the removal notice.

The February 2003 notice included four charges: (1) failure to immediately report an accident (relating to an incident in which a storm door banged shut on Plaintiff's

---

[4]     Conversely, the timing between Plaintiff's first EEO filing — filed on October 3, 2000 and settled on December 6, 2000 — and the February 2003 notice provides no support for such an inference.

7

elbow as he attempted to put mail in a slot, which he did not report until the next day); (2) failure to work in a safe manner (relating to the same incident); (3) failure to follow instructions (referring to six instances of unauthorized expansion of street time in January 2003); and (4) violation of the Last Chance Agreement (relating to all of the above infractions).  There is some evidence that the first two charges may have been unfounded; an independent arbitrator ultimately found that Plaintiff's failure to immediately report the accident was "a reasonable judgment call" under the circumstances, and that Plaintiff's accident was "caused by the wind, more so than his failure to abide by" proper procedures.  (Pl.'s Cert. Ex. P.)  However, Plaintiff offers no reasonable justification for his continued unauthorized expansion of street time or his violation of the Last Chance Agreement.  Specifically, Plaintiff admits that he failed to complete his route on time on the six occasions charged in the removal notice.  In fact, Plaintiff admits that he failed to complete his route on time the vast majority of the nearly twenty years he was assigned to Route 955.  There is also undisputed evidence that numerous substitute carriers — despite lacking Plaintiff's familiarity and experience with the route — were able to complete Route 955 on time, as was Plaintiff when he was under direct supervision.  Even prior to 2000, different managers had issued Plaintiff five warning letters and a notice of suspension for failing to complete his route within the proper time.

In short, the undisputed evidence demonstrates that Plaintiff's failure to perform his job according to the rules — and his employer's meting out discipline as a consequence — commenced well before any of his EEO activity, and continued despite the fact that Plaintiff knew he was subject to the Last Chance Agreement, and despite the provision of close supervision and retraining to assist Plaintiff in meeting expectations.  On the whole, therefore, the evidence is insufficient to give rise to an inference that retaliation for protected activity was the likely cause of Plaintiff's termination.  In fact, the undisputed evidence tends to negate such an inference.  For these reasons, the Court concludes that Plaintiff has failed to establish a *prima facie* case of retaliation.

Even assuming that Plaintiff has met his burden of establishing a *prima facie* case, however, the Postal Service has articulated legitimate, non-retaliatory reasons for Plaintiff's termination — specifically, his perpetual failure to complete his route on time and his violation of the Last Chance Agreement, as discussed above.

Thus, the burden of production would return to Plaintiff, who, by a preponderance of the evidence, "must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action."  *Moore*, 461 F.3d at 342.  "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions."  *Id*.  Plaintiff has failed to produce such evidence.

8

In addressing causation in the context of Plaintiff's *prima facie* case, the Court has already discussed the reasonable inferences which could be drawn from the evidence as a whole. That discussion and the Court's conclusions are equally applicable here. Even if a jury could agree with the arbitrator that the first two charges in the removal notice were not ultimately founded, a finding that the employer was wrong or mistaken in filing these two charges does not, without more, lead to an inference that the charges were a pretext for retaliation. *See Fuentes*, 32 F.3d at 765. Such an inference is negated by the fact that the third and fourth charges had a clear and undisputed basis. The Defendant had multiple legitimate reasons to terminate Plaintiff in February 2003; as such, there was simply no need for the Defendant to fabricate reasons to hide retaliatory animus. The fact that Plaintiff actively filed grievances and EEO complaints over the years does not protect him from being fired for legitimate cause, and does not — in light of the evidence here — suffice to support a finding that the Postal Service's reasons were pretextual or that retaliation was the real reason for his termination.

For these reasons, Defendant is entitled to summary judgment on Plaintiff's claims of retaliation with respect to the February 2003 removal notice.

### C.   June 2003 Removal Notice

The June 2003 Notice of Removal charged plaintiff with (1) violation of the Last Chance Agreement, (2) repeated unauthorized expansion of street time, (3) engaging in time wasting practices, and (4) failure to follow instructions. Because Plaintiff was terminated pursuant to the February 2003 removal notice, the June 2003 removal notice was never adjudicated. Therefore, this notice did not cause Plaintiff to suffer any adverse employment action, and there is no *prima facie* case for retaliation as to this notice.

Even if the June 2003 notice were to qualify as adverse action, the Court's analysis and conclusions would be the same as with respect to the February notice.

### CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment pursuant to Rule 56 is **GRANTED**, and Plaintiff's Complaint is **DISMISSED**. An appropriate Order accompanies this Letter Opinion.

s/William J. Martini

**William J. Martini, U.S.D.J.**